

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-25-00264-CR

———————————————————

RONALD ARTHUR BURDICK, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. DC89-CR2023-1272

---

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Appellant Ronald Arthur Burdick was convicted of murdering Michael Randall and sentenced to 35 years' confinement. On appeal, Burdick raises four issues. First, he contends that the evidence was insufficient to support the jury's rejection of his self-defense claim. Second, he complains that the trial court erroneously excluded certain testimony from his wife. Third, he argues that the trial court erred by improperly instructing the jury on certain first-aggressor evidence concerning Randall's prior attack on a coworker. Fourth, he asserts that the trial court egregiously harmed him by authorizing the jury to reject his self-defense claim and to convict him based on his provoking Randall. We will affirm.

## I. Background

Benny Lindeman owns a welding business and lives on its property. Ronald Burdick and his wife Lisa were Lindeman's neighbors, and they helped him from time to time. Michael Randall and Lance Copeland worked for Lindeman's welding business.

On June 8, 2023, Randall left his personal car at Lindeman's property and took a work truck to a job site. While there, Randall and Copeland got into an altercation. Among other things, Randall threatened Copeland with a hammer, left the job site, and abandoned the work truck.

Lindeman decided to fire Randall. Later that day, Lindeman's daughter, Cami Thornton, texted Randall that he had been fired and told him he had 48 hours to get

his personal car. Thornton and Burdick requested that the sheriff's office send a deputy when Randall came to get his car and final paycheck. Randall did not immediately come for his car.

Before the 48-hour deadline, Burdick—who neither worked for Lindeman nor owned any part of Lindeman's property or business—called the sheriff's office to request that they search and tow Randall's car from Lindeman's property. The officer explained that he had no basis to do either, so Burdick had the car privately towed. When Randall found out, he was mad at Burdick and sent him angry, curse-laden texts.

Early the next morning, a sheriff's deputy went to Lindeman's and spoke with Burdick. Burdick was irritated, wanted to file a complaint against Randall, and wanted Randall barred from Lindeman's premises. The sheriff's deputy told Burdick that the sheriff's office could give Randall a criminal-trespass warning.

By mid-morning, Randall asked his brother for a ride to get his final paycheck. Randall texted Thornton—who was not on Lindeman's property—that he was coming, and she told him to wait off premises until she got there. She texted that he could find his paycheck at the end of the property's driveway, and she told him not to come up the driveway.

Thornton texted Lisa, who was at the property with Burdick. Instead of placing the paycheck at the driveway's end as Thornton had decided, Burdick told Lisa to put it in a bucket on the property. Burdick again asked the sheriff's office to come and bar

Randall from the property. An investigator told Burdick to keep Randall there "as long as possible" so deputies could arrive. But the sheriff's office did not tell Burdick to keep Randall there at all costs, and Burdick said nothing about his planning to use a gun to keep Randall there.

When Randall arrived, the paycheck was not where Thornton had told him it would be. Randall texted Thornton. She at first asked him to drive away, but after checking with Burdick, she sent Randall a photo of the bucket with the paycheck. She wrote, "Get it and leave."

When Randall's brother drove onto the property, he saw Burdick and Lisa standing outside. According to Randall's brother, Randall got out and "walked straight to the . . . bucket." The brother kept the truck in drive and his foot on the brake. Randall got his paycheck. While he was walking back to the truck, his brother said he saw Burdick's lips moving but did not hear anything. According to the brother, Randall did not turn around but may have cursed, got in the truck, and calmly closed the door.

According to the brother, Burdick walked toward the truck and raised his shirt, revealing a gun in his right pocket. Burdick tried to open the door and knocked on Randall's window, which Randall lowered. Randall's brother said that both of Randall's hands were on an armrest, and he described Randall as not "jumping out the window," "swinging," or "punching the window." Randall said, "You got a pistol; pull that pistol." The brother then heard a gunshot and saw blood pouring out of

Randall's head. A "split second" later, he saw Randall facing forward in the seat with his head down. The brother put the truck in park and heard Burdick tell Lisa, "[H]e reached for my gun." Randall's brother called 911, and he told responding officers that Burdick "came up with a gun and shot my brother."

Burdick and Lisa told a different story. After Lisa had called 911, Burdick called the sheriff's office, and he admitted to shooting Randall. Burdick claimed that Randall had "struck him," "hit him," and had been reaching for his gun. According to Burdick, Randall said, "I'm going to get that fucking gun[,] and I'm going to kill you." He said that to avoid being shot with his own gun, he shot Randall. Burdick claimed that he pushed Randall back into the truck.

Additionally, Lisa claimed that she saw Randall get his paycheck and that he cursed at her, scaring her. She said that Randall had reached for and grabbed Burdick's arm and that "[t]here was a struggle." She heard a gunshot, went into the building, and called 911 because she thought her husband might have been shot.

Burdick shot Randall below his right nostril, and the bullet exited the back of his head and hit the upper left corner of the truck's front windshield. The bullet's trajectory became a debated point on whether Randall was simply turned within the truck and facing Burdick—as the medical examiner had testified "would make sense"—or had his head out of the window as he lunged at Burdick—as Burdick and Lisa had claimed.

A responding deputy saw and photographed Randall in the truck, facing forward, with his hands in his lap, grasping the paycheck. The medical examiner testified that the bullet perforated Randall's brain stem, and that the injury would have caused immediate incapacity and would not have allowed him to do anything voluntarily. She opined within a reasonable degree of medical certainty that Randall was grasping his paycheck with both hands at the time he was shot and killed, and the State argued that this proved that Randall was not grabbing Burdick's arm or lunging for his gun.

On the other hand, Burdick called an emergency-room doctor, Dr. Justin Fairless, as an expert witness. Dr. Fairless reviewed the medical examiner's autopsy report and concluded that Randall had not died instantaneously from the brain injury and that there could have been a period of "continuous survival" after Burdick shot him. He believed it was "reasonable to suggest that the head could have been at the level of the window or out the window." Dr. Fairless also testified—based on the blood on Randall's hands and the paycheck—that he was not holding his paycheck when shot but had grabbed it with both hands after being shot.

Later toxicology testing indicated that Randall had consumed methamphetamines before his death. Indeed, Dr. Fairless testified that Randall had tested positive for a "massive" amount of methamphetamines.

Under Burdick's self-defense theory, his counsel argued that Randall was a "raging lunatic"—who was "raving like a madman" and "skitzing to the max" because

6

"[h]e [was] fueled with meth"—and compared him to a "charging," "snarling" dog. The State strongly disputed Burdick's version of events and argued that the physical evidence demonstrated that Burdick had been the aggressor and had simply murdered Randall. The State argued that Randall had never used or attempted to use any unlawful force. It further argued that Randall was in the truck and not lunging at Burdick when Burdick shot him, and it alternatively argued that self-defense did not cover Burdick's conduct if he provoked Randall.

After considering all the evidence, the jury resolved the disputed fact issues, rejected Burdick's self-defense claim, found him guilty of murder, and assessed his punishment at 35 years' confinement. The trial court sentenced Burdick accordingly.

## II. Charge Error

Before taking up Burdick's legal-sufficiency issue concerning the jury's rejection of his self-defense claim, we address his related fourth issue: whether the trial court erred by authorizing the jury to reject his self-defense claim based on his provoking Randall. We conclude that the trial court properly instructed the jury on provocation.

### A. Standard of Review

We review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Garrett v. State*, No. 02-25-00049-CR, 2025 WL 3039150, at *1 (Tex. App.—Fort Worth Oct. 30, 2025, pet. ref'd) (mem. op., not designated for publication). If no error occurred, our analysis ends. *Kirsch*, 357 S.W.3d at 649; *Garrett*, 2025 WL 3039150, at *1.

7

## B. Provocation and the Right of Self-Defense

A person is justified in using force against another when he reasonably believes that such force is immediately necessary to protect himself from the other person's use or attempted use of unlawful force. Tex. Penal Code § 9.31(a). Further, a person may justifiably use deadly force against another if he would be justified in using force under Section 9.31 and when and to the degree he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. *Id.* § 9.32(a)(1), (a)(2)(a). "A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Elizondo v. State*, 487 S.W.3d 185, 196–97 (Tex. Crim. App. 2016) (internal citations omitted).

But one of the law's limitations on the right of self-defense—rooted in the common law and codified in Section 9.31(b)(4) of the Texas Penal Code—is the doctrine of provocation—also known as "provoking the difficulty." *See* Tex. Penal Code § 9.31(b)(4); *Elizondo*, 487 S.W.3d at 196–97; *Smith v. State*, 965 S.W.2d 509, 512–13 (Tex. Crim. App. 1998). Simply put, a defendant who provokes an attack may forfeit his right to self-defense. Tex. Penal Code §§ 9.31(b)(4), 9.32(a)(1).[1]

---

[1]A turn-of-the-last-century opinion from our highest criminal court provides the following illustration:

Under *Smith*, "[a]n instruction on provocation should only be given when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." 965 S.W.2d at 514. Specifically, a provocation instruction is required when there is sufficient evidence of the following:

> (1) that the defendant did some act or used some words [that] provoked the attack on him,
>
> (2) that such act or words were reasonably calculated to provoke the attack, and
>
> (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Elizondo*, 487 S.W.3d at 197 (quoting *Smith*, 965 S.W.2d at 513).

We must view the evidence in the light most favorable to giving the instruction, *Smith*, 965 S.W.2d at 514, and we do not decide whether the "evidence actually established that the appellant provoked the difficulty with the intent to harm the deceased," *id.* at 519–20. That is for the jury to decide. *Id.* at 520; *Mendoza v. State*, 349 S.W.3d 273, 281 (Tex. App.—Dallas 2011, pet. ref'd); *see also Frederick v. State*,

---

> A. has a grudge against B. He arms himself, and goes to a place where he knows he will meet B. He knows, or has reason to believe, that B. will resent an insult. He curses and abuses B. B. resents the insult, and makes an assault upon A., whereupon A. shoots and kills B. Now, if A. sets up self-defense, it would be the duty of the court, in giving a charge on that subject, to also give a charge on provocation, limiting A.'s right of self-defense.

*McCandless v. State*, 42 Tex. Crim. 58, 61, 57 S.W. 672, 673–74 (1900).

No. 14-23-00868-CR, 2025 WL 1037268, at *5–6 (Tex. App.—Houston [14th Dist.] Apr. 8, 2025, no pet.) (mem. op., not designated for publication).

## C. The Evidence

The trial court instructed the jury on the law of self-defense and provocation, informing the jury that self-defense "does not cover conduct of the actor if the actor provoked the other's use or attempted use of unlawful force" unless the actor seeks to abandon the encounter and the other persists in the use or attempted use of unlawful force. Burdick does not take issue with the instruction's wording; rather, he argues that "[t]here is no evidence at all that [Burdick] did anything to induce Randall to lunge for his gun as part of a planned scheme to kill Randall in a scenario of contrived self-defense." We disagree.

### 1. Evidence supports the provocation-in-fact element.

It is unclear whether Burdick is challenging *Smith*'s first element. But viewing the evidence in favor of the trial court's instructing the jury on provocation, the record contains evidence from which a jury could determine that Burdick provoked Randall:

- Burdick did not work for Lindeman and did not own the property where Randall's personal car was parked.

- Despite his lack of an ownership interest in Lindeman's property or business, Burdick asked the sheriff's office to search and tow Randall's car from Lindeman's.

- Burdick—of his own volition and without Lindeman's foreknowledge—had Randall's car privately towed and impounded.

- When Randall found out and texted Burdick, Burdick initially responded that he did not know who was texting him.

- Lindeman's daughter wanted Randall's final paycheck placed on the edge of Lindeman's property and told him not to come on the property.

- Instead of following the daughter's instructions, Burdick told his wife to place Randall's paycheck in a bucket on the property, causing Randall and his brother to come onto the property.

- Burdick and his wife were waiting outside when Randall came to get his paycheck.

- As Randall got his paycheck, according to his brother, Burdick said something to him, Randall said something back—possibly "Fuck you, motherfucker"— and walked toward the truck.

- Randall's brother saw Burdick raise his shirt and display a gun in his right pocket.

- Burdick tried to open Randall's door, but Randall held it closed, eventually manually locking it. Burdick then began knocking on the window, and Randall rolled it down.

- The two men exchanged words, and although the witnesses' accounts varied about whether Randall had lunged or reached out the window toward Burdick, Burdick said that he had shot Randall in the face because Randall had lunged out the truck's window at him and was trying to grab his gun.

- Burdick's wife admitted that her husband had brought a second gun to Lindeman's property, but she claimed to not recall whether she had told Lindeman's daughter not to tell law enforcement that it was Burdick's.

From this evidence, a rational jury could conclude beyond a reasonable doubt that Burdick—through his acts or words—did provoke Randall to attack him through the window. *See Elizondo*, 487 S.W.3d at 197; *Smith*, 965 S.W.2d at 514.

11

## 2. Evidence supports the element that Burdick's acts or words were reasonably calculated to provoke Randall's attack.

Attempting to refute *Smith*'s second element, Burdick characterized himself as "easy-going"; a "[r]elaxed, chill person"; and not a "yeller or screamer"—claiming that he possesses personal "traits inconsistent with a person who would hurl insults in a[n] effort to provoke an assault against him." He argued that he had no idea Randall was "full of a massive amount of methamphetamine" and claimed that Randall's actions were "reasonably unforeseen."

But we must view Burdick's words and acts "in conjunction with the relations of the parties and other circumstances surrounding the difficulty." *See Elizondo*, 487 S.W.3d at 199; *Smith*, 965 S.W.2d at 517. Viewing the evidence in the light most favorable to the instruction, Randall came onto the property only because Burdick directed that Randall's paycheck be placed on the property and not where Lindeman's daughter had instructed. Randall went straight to retrieve it, and according to his brother, Burdick spoke first. Randall's brother could not hear what Randall said in response and testified that Randall could have been cursing but "never even turned his head" and walked straight back to the truck. Burdick showed his gun while pursuing Randall, tried forcing open Randall's door, and knocked on his window.

Even if Burdick did not know that Randall had consumed drugs, Burdick knew from Randall's texts that Randall was angry about Burdick's having Randall's car towed. Despite portraying himself as "easy-going" and "chill," law enforcement

12

described Burdick that morning as being "irritated" and "agitated" at Randall to the point of asking to file a complaint against Randall for his early morning texts.

The record also indicates that in Burdick's post-shooting interview with law enforcement, he claimed that Randall had threatened to kill him and come after his family. Burdick claims that Randall's actions were "reasonably unforeseen," but the evidence belies that statement. Burdick had repeatedly requested that someone from the sheriff's office be present when Randall was expected at Lindeman's property. Instead of waiting for the sheriff's office to arrive, Burdick stood outside Lindeman's building and had brought two guns to the paycheck pickup, one of which he carried and used to shoot Randall in the face.

From this evidence, the jury could have rationally concluded that Burdick's own words and acts were reasonably calculated to provoke Randall to attack him. *See Smith*, 965 S.W.2d at 517–18 (viewing evidence of defendant's continued exchanges, in the face of victim's warning of an attack, as supportive of a jury's finding that the circumstances were reasonably calculated to cause an attack by the victim).

### 3. Evidence supports the intent element.

*Smith*'s final requirement—that Burdick's acts and words were mere pretext for killing Randall—is a fact question to be determined from all circumstances, and we may consider Burdick's acts and words "occurring before, during, or after" the provocation. *See Elizondo*, 487 S.W.3d at 201; *see also Smith*, 965 S.W.2d at 518 (recognizing that bad feelings toward the victim can shed light on the defendant's

13

intent). Cases concluding that a trial court improperly gave a provocation instruction because of insufficient evidence on the third element are a "rarity" and "typically involve strangers or circumstances in which it is not conceivable that the defendant had orchestrated events for the purpose of gaining a pretext to harm the complainant." *Engel v. State*, 630 S.W.3d 192, 199–200 (Tex. App.—Eastland 2020, no pet.) (citing *Smith*, 965 S.W.2d at 518–19).

As we have outlined above, Burdick and Randall were not strangers and had been antagonizing each other the day before and the day of the shooting. Although Burdick argues that he was simply trying to "subdue" and "deter" Randall by displaying his gun and to keep him on property until a sheriff's deputy arrived, such an argument flips the standard on its head by asking us to view the evidence in the light most favorable to him—rather than to the instruction. Accordingly, we conclude that ample evidence could have supported the jury's determination that Burdick intended to provoke Randall as a pretext for killing him. *See Smith*, 965 S.W.2d at 516 ("Killing under the guise of self-defense by drawing the victim into an argument which leads to an attack is precisely what the doctrine of provocation is designed to address.").

Viewing the evidence in the light most favorable to the trial court's inclusion of the instruction, we conclude that the record contains sufficient evidence "that *could* support a jury's finding of all three elements of provocation beyond a reasonable doubt." *Elizondo*, 487 S.W.3d at 197. Accordingly, we hold "that the evidence was

14

sufficient to allow the jury to pass on" the issue of provocation. *See Smith*, 965 S.W.2d at 520; *see also Guillen v. State*, No. 04-14-00772-CR, 2016 WL 4444444, at *7 (Tex. App.—San Antonio Aug. 24, 2016, no pet.) (mem. op., not designated for publication). We overrule Burdick's fourth issue.

### III. Evidentiary Sufficiency

Turning back to Burdick's first issue, we consider his legal-sufficiency challenge concerning the evidence supporting his murder conviction and the jury's rejection of his self-defense claim. We conclude that the evidence was sufficient.

**A. Standard of Review and Applicable Law**

A defendant has the burden of producing some evidence to support a claim of self-defense. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The State has the burden of persuasion in disproving self-defense. *Id.*; *see also Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). This burden does not require the State to produce evidence refuting the self-defense claim; rather, the burden requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. Self-defense is a fact issue for the jury to determine. *Saxton*, 804 S.W.2d at 913–14. With a verdict of guilty, a jury implicitly rejects a defendant's self-defense theory. *Id.* at 914.

In reviewing the sufficiency of the evidence to support the jury's rejection of a self-defense theory, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential

elements of murder and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id.*; *see Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The indictment charged Burdick with committing murder by "intentionally and knowingly caus[ing] the death of an individual, namely Michael Randall, by shooting a firearm at or in the direction of Michael Randall." *See* Tex. Penal Code § 19.02(b)(1).

16

As explained above, the trial court charged the jury on self-defense, including instructing it on provocation, and Section 9.32 of the Penal Code provides the conditions under which deadly force in self-defense is permissible. *Id.* § 9.32.

As applicable here, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Section 9.32 of the Penal Code, which authorizes deadly force in self-defense, provides as relevant to this case,

(a) A person is justified in using deadly force against another:

    (1) if the actor would be justified in using force against the other under Section 9.31; and

    (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:

        (A) to protect the actor against the other's use or attempted use of unlawful deadly force . . . .

*Id.* § 9.32. "The evidence does not have to show that the victim was actually using or attempting to use unlawful deadly force because a person has the right to defend himself from apparent danger as he reasonably apprehends it." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)).

"Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct." *Id.* (citation omitted). Burdick therefore does

17

not challenge the evidence that he killed Randall. Instead, he contends that the evidence was insufficient to support the murder conviction (and the jury's rejection of self-defense) because the evidence sufficiently showed that he was justified in using deadly force in self-defense.

## B. The Evidence

The evidence conflicted on several points, including

- what Randall said to Burdick when he came to collect his final paycheck;

- whether Randall remained seated or lunged at Burdick through the window;

- whether Randall died immediately or could have briefly survived;

- whether Randall grasped the paycheck at the time of the shooting or after being shot;

- whether Randall's final body positioning was as it was shown in the photos or whether his body had been moved;

- what, if anything, could be inferred from the location of a shell casing found beside the truck;

- whether the blood and brain matter that investigators found inside and outside the truck indicated that Randall had been shot inside or outside the truck;

- whether the lack of injuries on Randall's hands or any injuries to Burdick signified that Randall had not hit or struggled with Burdick or reached for his gun; and

- overall, the veracity and credibility of Randall's brother's version of events versus Burdick's and Lisa's competing version.

But there is no evidentiary dispute that Burdick had Randall's car towed the day before the shooting and had Randall's paycheck moved onto Lineman's property,

18

forcing Randall to come onto the property to get it. After Randall got his paycheck, Lisa testified that Burdick followed him back to the truck with his gun. Burdick knocked on the door, tapped on the window, and showed Randall his gun.

Once Randall got in the truck, Burdick—who was on foot outside of the truck—could have avoided the confrontation according to one investigating law-enforcement officer had he simply "move[d] out of the way." Instead, he shot Randall in the face. Even Lisa admitted during cross-examination that if the paycheck had been placed outside of the property—instead of in the bucket as Burdick had wanted—the shooting could have been avoided. She also agreed that the shooting could have been avoided if Burdick was not waiting for Randall with a gun.

We must presume that the jury resolved all evidentiary conflicts in favor of the prosecution and defer to that resolution. *See Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.). Viewing all the evidence in this light, there is sufficient evidence in the record to rationally support the jury's rejection of Burdick's version of the events. Specifically, the jury could have believed that Burdick lured Randall onto the property, tried to keep him there, and then shot him while Randall yelled at him from within the truck. Alternatively, the jury could have believed that Burdick provoked Randall to lunge out of the vehicle to then shoot him instead of simply moving out of the way. *See, e.g., Smith*, 965 S.W.2d at 516 ("Just as the jury could have found the defendant made an unprovoked attack on the victim, the jury could also have found that victim made a provoked attack on the defendant.");

19

*Frederick*, 2025 WL 1037268, at *5 (allowing the jury to have resolved the he said/she said dispute underlying the provocation issue); *Pearson v. State*, No. 10-23-00172-CR, 2024 WL 3371441, at *2 (Tex. App.—Waco July 11, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that the jury could have found the defendant guilty of assault by finding either that he struck his victim in the back of the head as the victim was walking to his bedroom or that the victim made the initial attack on the defendant but that the defendant had forfeited his right to self-defense by provoking the assault).

Either way, a rational factfinder could have found the essential elements of murder beyond a reasonable doubt and found against Burdick on his self-defense claim beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. We therefore hold that the evidence is sufficient to support the jury's implicit rejection of Burdick's self-defense claim. We overrule his first issue.

## IV. Exclusion of Randall's Statements to Lisa

In his second issue, Burdick argues that the trial court abused its discretion by excluding evidence from Lisa "reflecting Randall's excitement and state of mind at the time he was shot." Because the jury heard the same or similar evidence to what Lisa would have said, even assuming the trial court erred by excluding the complained-of testimony, we disagree that Burdick has shown harm.

## A. Standard of Review

To preserve error when a trial court excludes evidence, a party must show the substance of the excluded evidence by offer of proof unless the substance is apparent from the context of the questions asked. Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009). We review a trial court's exclusion of evidence for an abuse of discretion. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024); *Bautista v. State*, 189 S.W.3d 365, 368 (Tex. App.—Fort Worth 2006, pet. ref'd). Generally, excluding evidence is harmless when similar evidence is admitted. *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) ("[R]eversal is not required by exclusion of evidence where the same testimony was later admitted without objection.").

## B. The Five Excluded Statements

When the State objected on hearsay grounds to Lisa's testifying about what Randall said to her and Burdick when he came for his paycheck, the trial court allowed Burdick to make an offer of proof outside the jury's presence. Burdick complains that the trial court erred by excluding the following five statements from Lisa about what Randall said to her:

- "[H]e said he was going to kill me";

- "I'm going to fucking kill you, you fucking cunt";

- "You motherfucker, this isn't over";

- "I'm going to take your fucking gun"; and

- "I'm going to fucking get your fucking gun" while grabbing for Burdick's gun.

Burdick argues that these statements were admissible as excited utterances or showing Randall's state of mind under exceptions to the hearsay rule. *See* Tex. R. Evid. 803(2), (3).

Although Burdick complains about the exclusion of these five statements, the trial court allowed the jury to consider the same or similar evidence from other sources, including Lisa. In fact, Lisa testified—without objection—that when Randall came for his final paycheck, she felt uneasy because of his aggressive tone and "[a]ngry face that [she couldn't] get out of [her] head." She testified that Randall "started cussing at [her]" when he got out of the truck. She said that Randall "did not charge" her but was "making threats" toward her. She told the jury without objection that Randall "called [her] a fucking cunt."[2]

---

[2]In response to the State's next question, Lisa then tried to testify that Randall "also said . . . he was going to fucking kill [her]," but the State objected to that statement. The trial court excused the jury to consider the objection and, because of a medical emergency, resumed trial four days later—at which time it instructed the jury to "disregard any statements by this witness of what anyone else said." But the State had not objected to Lisa's first statement—only her second one—so the first one was before the jury.

Despite the trial court's disallowing Lisa's testimony about Randall's threatening to kill her, the trial court admitted a photograph of a text message that Lisa sent to Thornton during the altercation saying exactly that: "OMG [Randall] yelled I will fucking kill u." Thornton responded, "Call the sheriff now and tell them he has made a direct threat to your life." Lisa later texted, "He grab Ron's gun" and "911 on way."

In addition to this evidence from Lisa, the trial court admitted Burdick's recorded interview at the sheriff's office. In that interview, Burdick explained that Randall had threated to kill him and "come after [his] family." Burdick described Randall as "belligerent," "cussing," and "blabbering a bunch of bullshit"—including yelling "fuck you"—when he showed up to get his paycheck.

Burdick said that he was standing outside with Lisa behind him and did not know if Randall was talking to him or Lisa. He said that he tried to calm Randall down, but Randall told him "I'm going to whoop your fucking ass." He described Randall as "blazing saddles" and said that he "definitely did not want [Randall] to get any further past me [toward Lisa]."

He said that Lisa was calling 911 while he tried to keep Randall on the property. Burdick acknowledged approaching the truck and tapping on Randall's window, and he testified that Randall rolled it down, lunged out of the window, grabbed his arm, and yelled, "I'm going to get that fucking gun out, and I'm going to kill you." That's when Burdick said he shot Randall.

23

Considering the record as a whole, assuming without deciding that the trial court erred by excluding the five statements, we conclude that any such error did not affect Burdick's substantial rights because Lisa's other testimony and texts and Burdick's recorded video interview contained the same and similar evidence about Randall's threatening statements and state of mind leading up to the shooting. *See Jackson v. State*, No. 02-24-00417-CR, 2026 WL 547518, at *8 & n.12 (Tex. App.—Fort Worth Feb. 26, 2026, no pet.) (mem. op., not designated for publication); *Polk v. State*, No. 02-13-00556-CR, 2015 WL 1883014, at *9 (Tex. App.—Fort Worth Apr. 23, 2015, pet. ref'd) (mem. op., not designated for publication); *Alvarez v. State,* No. 02-05-376-CR, 2007 WL 117700, at *1 (Tex. App.—Fort Worth Jan. 18, 2007, no pet.) (mem. op., not designated for publication) ("[T]he trial court's exclusion of the evidence was harmless because similar evidence was admitted through the same witness and two other witnesses later in the trial."). We overrule Burdick's second issue.

## V. Instructing the Jury on Randall's Prior Threats and Bad Acts

In his third issue, Burdick complains that the trial court's instructions about Randall's prior bad acts and threats against his coworker, Copeland, egregiously harmed him. He contends that the trial court's instructions "preclude[ed] the jury from considering Randall's prior bad acts and threats against . . . Copeland to decide the reasonableness of [Burdick's] fear of danger by Randall and whether Randall was the first aggressor and by failing to instruct the jury on these issues." We disagree.

24

**A. Standard of Review and Applicable Law**

We have articulated above the standard of review applicable to unobjected-to charge error when no error has occurred. *See Kirsch*, 357 S.W.3d at 649; *Garrett*, 2025 WL 3039150, at *1. But if an error has occurred, we must analyze the error for harm, which turns on whether it was preserved. *Jordan*, 593 S.W.3d at 346 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018).

Where a defendant fails to preserve jury-charge error—as here—we will reverse only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 171; *see* Tex. Code Crim. Proc. art. 36.19. The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

To assess harm, we consider (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of the probative evidence; (3) the argument of counsel; and (4) any other relevant information in the record as a whole. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). A finding of egregious harm must be based on actual rather than theoretical harm. *Id.* Egregious harm is a difficult standard to meet and requires a fact-specific analysis. *Id.* Jury-charge error causes egregious harm if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.*

25

## B. The Challenged Instruction

The trial court addressed the jury about "certain acts against a third party prior to the alleged offense" that Randall had committed. Specifically, the trial court instructed the jury:

> In this case evidence has been introduced that the deceased, Michael Randall, committed certain acts against a third party prior to the alleged offense against the Defendant. This evidence was admitted only for the purpose of assisting you, if it actually does assist you, to show all relevant facts and circumstances surrounding the killing and the previous relationship existing between the defendant and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the offense, if any. *You cannot consider the evidence for any other purpose, and specifically, you cannot consider the evidence as evidence of the deceased's character to show that on a particular occasion, he acted in accordance with the character.* Also, you cannot consider this evidence unless you find and believe beyond a reasonable doubt that the defendant [sic] committed these acts, if any. [Emphasis supplied.]

Burdick acknowledges that the second sentence of this instruction "is not at issue" and tracks Article 38.36 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.36(a).[3] But he argues that the italicized limiting instruction "was wrong as a matter of law."

Burdick points out that the State asked witnesses about Randall's altercation with Copeland the day before the shooting, including Randall's throwing a C-clamp at

---

[3]In all murder prosecutions, either side is "permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. art. 38.36(a).

26

him and threatening him with a hammer. When the State elicited testimony about this altercation, it did not ask for a limiting instruction, so Burdick argues that this evidence "bec[ame] part of the general evidence and [could] be used for all purposes." *See Hammock v. State*, 46 S.W.3d 889, 892 (Tex. Crim. App. 2001). Burdick therefore argues that the trial court erred by including the language limiting the jury's consideration of the evidence about Randall's conduct toward Copeland. He contends that the trial court's instruction precluded the jury from considering the evidence in support of his theories that (1) Randall was the first aggressor toward Burdick, (2) Burdick reasonably apprehended that Randall was dangerous, and (3) Burdick acted in self-defense.

The State articulates the two theories on which a defendant asserting a self-defense theory may offer evidence of the deceased's character for violence or aggression: first, to show the reasonableness of the defendant's claim of apprehension—that is, to prove the defendant's self-defensive state of mind; and second, to show that the victim was the first aggressor. *See Ex parte Miller*, 330 S.W.3d 610, 618–19 (Tex. Crim. App. 2009). But the State does not address *Hammock*'s impact on this case—that when the State offered the evidence, because it did not then request an instruction limiting the jury's consideration to *Miller*'s admissibility purposes, the evidence became admissible for all purposes. *See Hammock*, 46 S.W.3d at 892. We need not resolve whether the trial court erred by limiting the jury's consideration of the evidence concerning Randall's altercation with Copeland, because

27

even assuming (without deciding) that it was error for the trial court to give the limiting instruction after allowing the evidence to be admitted without a contemporaneous limiting instruction, any such error was harmless.[4]

## C. Reviewing for Harm

### 1. The Charge

Reviewing the whole charge, the trial court properly instructed the jury on Burdick's self-defense theory and did not err by instructing the jury on the issue of Randall's alleged provocation. On the specific issue of Randall's prior bad acts, Burdick acknowledges that the trial court properly instructed the jury under Article 38.36. *See* Tex. Code Crim. Proc. art. 38.36(a).

The trial court instructed the jury that it could consider "all relevant facts and circumstances surrounding the killing and the previous relationship existing between the defendant and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the offense, if any." The limiting instruction that followed simply instructed the jury that it could

---

[4]In the context of a defendant's own extraneous-offense evidence being admitted without a contemporaneous limiting instruction, courts have held that the trial court does not reversibly err in later limiting the jury's consideration of such evidence, reasoning that such an instruction actually benefits the defendant. *See, e.g.*, *Bridgefarmer v. State*, No. 02-19-00425-CR, 2020 WL 7258059, at *11–12 (Tex. App.—Fort Worth Dec. 10, 2020, no pet.) (mem. op., not designated for publication) (citing *Fair v. State*, 465 S.W.2d 753, 754–55 (Tex. Crim. App. 1971)). Here, because Randall's conduct was at issue, such a rationale does not apply.

not consider Randall's altercation with Copeland as evidence of his character to show that during the shooting he acted in conformity with that character.

From this language, the charge expressly permitted the jury to consider Burdick's state of mind in the hours leading to the shooting after his learning about what Randall had done to Copeland and why Lindeman had fired Randall. And as the State points out, the limiting instruction did not preclude the jury from considering the evidence for the "entirely separate . . . *non-character* purpose" of illustrating Randall's specific intent or motive for the alleged attack on Burdick. A view of the entire charge does not weigh in favor of egregious harm.

## 2. The Trial Evidence

Regarding the trial evidence, we have already discussed the competing evidence above and concluded that the evidence is legally sufficient to support the jury's implicit rejection of Burdick's self-defense claim. Concerning Randall's altercation with Copeland, Copeland's trial testimony regarding the C-clamp and hammer incident spans roughly eleven pages of the record. He described the altercation, including Randall's throwing a C-clamp and a pencil at him, Copeland's throwing a tape measure back, and his "literally walk[ing] around" a truck once while Randall grabbed a hammer and said, "Come on, motherfucker, you going to throw something at me." Copeland walked away without incident. At trial, he testified that he didn't know what Randall's "intents were" as far as using the hammer on him, but he said, "I don't think he would have took it to that extreme."

29

Even if the jury could have considered this evidence to show that Randall was the first aggressor toward Burdick, it was weak evidence. The incident resolved quickly with no harm to anyone and really had nothing to do with the shooting other than providing context for why Lindeman had fired Randall. It did nothing to explain why or whether Randall acted first the next day when Burdick confronted him with a gun.

And on that point, the jury heard evidence from both Lisa and Burdick that Randall was upset at Burdick about his car being towed, had threatened and cursed at them, was acting belligerently toward them, and had lunged for Burdick's gun. This was the core evidence at the heart of Burdick's self-defense claim. In contrast, the evidence of Randall's C-clamp- and pencil-throwing, tape-measure-dodging, and hammer-holding incident from the prior day had little to do with his or Burdick's conduct during the shooting or Burdick's overall defensive theory asking the jury to consider the physical evidence and to believe Lisa's and Burdick's version of events over Randall's brother's—a theory that the jury rejected. This factor does not weigh in favor of egregious harm.

### 3. The Closing Arguments

Concerning the argument of counsel, the State began by arguing that Burdick was the aggressor and did not bring up Randall's altercation with Copeland. In response, Burdick argued that the State had not overcome its burden of disproving Burdick's self-defense claim and that Randall was to blame for the shooting.

Both sides argued about Randall's altercation with Copeland. Burdick pointed out Randall's texting Lindeman that "my state of mind is fucked" after being fired and told he was being barred from the property. Burdick described Randall as being a "dangerous man" at that point and "raving like a madman" at Burdick on texts. He described Randall's looking for his car by "prowling at [Burdick's] property." He described Randall's last text to Burdick, in which Randall threatened to slash Burdick's tires, called him a "fucking liar," and told Burdick, "You're paying for this." Burdick argued that this showed Randall's state of mind in contrast to his own response in informing law enforcement about the hammer incident.

Burdick walked through the events leading up to the shooting, explaining how he was not acting "rogue" or "like some vigilante" and had shot Randall because Randall had battled Burdick and lunged for his gun. Burdick also argued about the positive toxicology report and speculated about whether Randall had been "fueled" by methamphetamine the day before when dealing with Copeland. Burdick asked the jury to compare his calm demeanor and his actions in cooperating with law enforcement to Randall's conduct in allegedly "fighting" Burdick. Burdick also argued that Randall was a dangerous person who "should have been locked up . . . on the hammer incident."

The State asked why Burdick had moved the paycheck and disputed his narrative that Randall was acting as Burdick had described. Concerning Copeland, the State reminded the jury that Lindeman had spoken with Copeland but was not afraid

of Randall after that conversation. The State also brought up Thornton's texts and testimony in which she indicated her belief that Randall was going to get his paycheck and leave.

In sum, both sides argued extensively about whether the jury should believe Randall's brother's testimony—that Randall did not provoke Burdick or lunge at him—or Lisa's and Burdick's version of events—that Randall had lunged at Burdick and was the first aggressor.

In addition, both sides focused on and contested what the jury could infer from the photo of Randall's clutching his final paycheck after the shooting. The State argued that its expert had proved that Randall died immediately, so the photo showed his last act of clutching the paycheck and disproved the lunging argument. On the other hand, Burdick argued that his expert had proved that Randall had lunged out the window, then was shot, and later grabbed the paycheck, which is why a photo shows him holding it.

Although each side talked about the altercation with Copeland, at no time during the argument did either side mention or draw any attention to the charge's limiting instruction, and the State never argued or objected that Burdick's argument violated the trial court's limiting instruction. Examining all the arguments, this factor does not weigh in favor of egregious harm. *See, e.g.*, *Wild v. State*, No. 06-22-00042-CR, 2022 WL 16559160, at *7 (Tex. App.—Texarkana Nov. 1, 2022, pet. ref'd) (mem. op.,

not designated for publication) (concluding that closing arguments did not weigh in favor of harm where neither side mentioned an erroneous instruction).

Accordingly, applying the relevant harm factors, we cannot say that the assumed charge error egregiously harmed Burdick. *See Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. We overrule Burdick's third issue.

## VI. Conclusion

Having overruled Burdick's four issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 2, 2026